JUSTICE LEAPHART
dissenting.
¶51 For the reasons set forth below, I dissent.
*206 ¶52 The Workers’ Compensation Court found “a lack of persuasive objective medical evidence verifying physical restrictions of claimant’s use of either of his arms impairing his ability to work. Objective medical evidence relating to the right arm is particularly lacking.” The court also did not find Nielson credible and believed he exaggerated his pain in both his testimony and his reports to doctors.
¶53 In support of these findings, the court noted that Dr. BenYoussef s opinion was based on Nielson’s subjective complaints, which the court did not find credible. The court also noted that, although Dr. Gaddy’s 1995 EMG testing found evidence of right and left carpal tunnel syndrome, “[m]ore recent testing and the opinions of other physicians cast serious doubt on the validity of her studies and diagnoses. Moreover, Dr. Ross testified that the methodology used by Dr. Gaddy is questioned in mainstream medical circles. I am not persuaded by Dr. Gaddy’s findings.”
¶54 A review of the record reveals substantial, credible evidence to support these findings. Dr. Ben-Youssef testified by deposition that his diagnosis was based on the information provided to him by Nielson and on Dr. Gaddy’s diagnosis, neither of which the court found persuasive. Dr. Ben-Youssef testified that, “the severity of the diagnoses are based on his subjective complaints. ... It’s all based on the pain complaints.”
¶55 Several letters in the record written by Dr. Ben-Youssef to the State Fund claims adjuster indicate his opinion is based on Nielson’s subjective complaints. In August 1997, he wrote, “[Nielson] does not need any additional treatment and the patient can perform in the short term in any of the three jobs that you sent me as sales clerk, video rental clerk and auto sales person, but the patient does have intermittent subjective severe pain of both upper extremity [sic] forcing him to stop any kind of activity for days.” In May 1998, he wrote, “[t]he patient has intermittent pain of the upper extremity with any activity, and all the jobs that you sent me do include that. I do not think the patient will be able to do them based on his subjective complaints.”
¶56 A review of Dr. Ben-Youssef s medical records for Nielson reveals the following notes:
June 27, 1995: The physical examination is within normal limit[s].
July 11, 1995: The physical examination shows no tenderness at the level of the extensor origin of the left wrist nor the flexor origin. No tenderness at the level of the cubital tunnel and *207 minimal restriction of the range of motion of left wrist.
September 10,1996: The physical examination is unchanged.
February 8, 1997: The physical examination is unchanged.
June 18, 1997: The physical examination is unchanged and the patient still complains of intermittent pain of both hands.
September 5, 1997: His physical examination is unchanged.
October 31, 1997: His physical examination is unchanged.
February 10, 1998: The physical examination is unchanged.
August 31, 1998: The physical examination is unchanged.
February 19,1999: The physical examination is unchanged.
¶57 I would conclude that substantial, credible evidence supports the Workers’ Compensation Court finding that Dr. Ben-Youssef s opinion was based on Nielson’s subjective complaints.
¶58 Although the Workers’ Compensation Court rejected Dr. Gaddy’s EMG and the opinions of Dr. Ben-Youssef and O’Neill, the court listed the medical evidence it did find persuasive. This evidence included: Dr. Williams’s findings from 1995 that “no abnormalities were found on neurophysiological testing;” Dr. Settergren’s diagnosis of left lateral epicondylitis; Dr. Rosen’s 1997 diagnosis of tendonitis and possible chronic pain syndrome; Dr. See’s normal EMG results in 1997; Dr. Cahill’s normal EMG results in 1998; Dr. Schultz’s finding of no obvious weakness or atrophy in the muscles of either arm and an obvious “psychiatric overlay;” and Dr. Ross’s finding that no objective evidence supported Nielson’s claims of right or left upper extremity pain.
¶59 The Workers’ Compensation Court, appropriately weighed the evidence and that court is in a better position to resolve conflicting medical evidence. The court heard live testimony from Nielson and Dr. Ross, in addition to considering the deposition testimony of Dr. BenYoussef. There is substantial, credible evidence supporting the court’s rejection of Dr. Ben-Youssef s opinion.
¶60 Finally, Nielson argues, and this Court concludes, that Dr. Ross’s reasoning was inconsistent because Dr. Ross initially stated that he was not satisfied with the 1997 FCE but later expressed his opinion that Nielson could return to his time of injury job without relying on O’Neill’s subsequent FCE. Nielson contends that this also implicates the opinions of the other two panel doctors because they did not express separate opinions, but simply concurred in Dr. Ross’s opinion.
¶61 The medical panel expressed their opinion by letter, stating:
The consensus opinion is to pursue the plan outlined by Dr. Ross beginning on page seven and extending to page eight of his note, *208 specifically recommending a work conditioning program of approximately two weeks duration with an entry and exit functional capacity evaluation. Following the work conditioning program and exit functional capacity evaluation, alternative job analysis could be considered, but we do not feel comfortable with making such recommendations based on his most recent functional capacity evaluation having been done one and a half years ago.
¶62 Subsequent to this letter, Nielson was seen by O’Neill and participated in an entry FCE, a two-week work conditioning program and an exit FCE. Nielson was only able to participate approximately one half hour per day in the work conditioning program. Dr. Ross testified that work conditioning programs generally last between four and six hours a day. Nielson also missed four of ten scheduled visits due to pain from the activities involved. O’Neill’s recommendation at the end of this program was, “Mr. Nielson is not a likely candidate for further Work Conditioning. Holding a job of any sort is questionable according to findings from the FCE and attempted Work Conditioning.”
¶63 After reviewing O’Neill’s report, Dr. Ross sent a letter to the State Fund concluding that, “there is no objective evidence that this gentleman could not return to his job of injury.... I would not restrict this patient at this time based on the panel examination, my interview/ evaluation and the functional capacity evaluations recently performed. It’s my opinion that he could return to his job of injury without limitation or restriction.”
¶64 Nielson argues that Dr. Ross indicated he would not express an opinion on Nielson’s work capability until an FCE was completed and then, “when Dr. Ross was not satisfied with the [FCE], he went ahead and expressed an opinion.” Nielson argues that this demonstrates Dr. Ross’s reasoning was flawed and should not have been accepted by the Workers’ Compensation Court.
¶65 At the hearing, Nielson asked Dr. Ross about this inconsistency.
Q: But if you felt uncomfortable giving any kind of an indication that my client could return to work until he did that, why didn’t you then say, well, I reject ... Mr. O’Neill’s report, I want to do another one, functional capacity and work hardening before you rendered an opinion?
A: I can speak for myself, not Dr. Cahill or Dr. Schultz, but from my standpoint, first of all, I want to get the most current information, and the FCE that was available to us was a year or *209 year and a half old. That was number one. Number two, when I did review Mr. O’Neill’s report, and this is not a reflection on Mr. O’Neill, the fact that I disagree with the way he phrased things is one thing, but I think his report is quite illuminating in the sense that it does point out the lack of participation, the symptom magnification, the decrease in strength and grip as just one example over the course of a conditioning program. That rendered the test, in my opinion, invalid. Therefore, in a situation like that, I frankly feel there is absolutely no benefit to the patient, the employer or any of the other stakeholders in the system in continuing to get [FCE’s] or work conditioning or work hardening programs if a person is not going to participate or cooperate. Therefore what, I have to base my decision on and what we as a panel based our decision on, because this was a consensus opinion, was the findings at the time of the examination. And those findings were subjective complaints without objective correlation.
¶66 The court’s finding on this issue stated, “Having reviewed the FCE report, listened to Dr. Ross’s explanation at trial, and observed claimant’s own testimony, I am persuaded by Dr. Ross’s evaluation of the O’Neill FCE. ... Thus, I find no objective medical basis for concluding claimant suffers any particular physical restriction resulting from injury to his right arm.”
¶67 Based on a review of the record, I would hold that there is substantial, credible evidence supporting this finding. Dr. Ross’s testimony explains sufficiently that, based primarily on Nielson’s lack of participation in O’Neill’s FCE, the FCE was invalid and he did not feel another FCE would be useful.
¶68 Having reached its finding, the court correctly concluded that Nielson was not permanently partially disabled according to § 39-71-116(18), MCA (1993). Accordingly, the Workers’ Compensation Court did not err in denying Nielson permanent partial disability benefits.
¶69 I dissent.
CHIEF JUSTICE GRAY joins in the dissent of JUSTICE LEAPHART.